IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| DONNA J. TODD, | ) Civil Action No. 3:12-1960-GRA-JRM |
| Plaintiff, | ) |
| v. | ) |
| | ) **REPORT AND RECOMMENDATION** |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY,[1] | ) |
| Defendant. | ) |

This case is before the Court pursuant to Local Civil Rules 73.02(B)(2)(a) and 83.VII.02, et seq., DSC, concerning the disposition of Social Security cases in this District. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB").

## ADMINISTRATIVE PROCEEDINGS

Plaintiff filed an application for DIB on June 12, 2009, alleging disability as of August 7, 2008. See Tr. 122, 47, 158. Plaintiff's claim was denied initially and upon reconsideration. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). A hearing was held on June 16, 2011, at which Plaintiff appeared and testified. Tr. 27-44. On July 29, 2011, the ALJ issued a decision denying benefits and finding that Plaintiff was not disabled because under the medical-vocational guidelines (also known as the "Grids") promulgated by the Commissioner, Plaintiff

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Commissioner Michael J. Astrue as Defendant in this action.

remains able to perform work found in the national economy. See generally 20 C.F.R. Part 404, Subpart P, Appendix 2.

Plaintiff was forty-eight years old at the time she was last insured for disability benefits. She has an eighth grade education. Tr. 30. Plaintiff's past relevant work was as a bulk mail sorter, carpenter/construction worker and food service supervisor. Tr. 31-33, 148. Plaintiff alleges disability due to metatarsal fractures with delayed healing/arthritis, fibromyalgia, joint pain, shortness of breath, depression, and bilateral shoulder tendinopathy. Tr. 13, 140.

The ALJ found (Tr. 13-21):

1. The claimant last met the insured status requirements of the Social Security Act on June 30, 2010.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of August 7, 2008 through her date last insured of June 30, 2010 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: metatarsal fractures with delayed healing; fibromyalgia; depression; and bilateral shoulder tendinopathy (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform a range of light work. Specifically, the claimant was able to lift and carry up to 20 pounds occasionally and 10 pounds frequently and stand, walk and sit for 6 hours each in an 8-hour day. Additionally, the claimant's shoulder condition limited her to no more than occasional overhead reaching. The claimant could frequently push and pull with her bilateral upper extremities and occasionally climb and crawl. Lastly, the claimant's depression caused moderate limitations in understanding, remembering and carrying out simple instructions.

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

2

7. The claimant was born on September 6, 1961 and was 48 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules directly supports a finding of "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date[ ] last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could heave performed (20 CFR 404.1569 and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from August 7, 2008, the alleged onset date, through June 30, 2010, the date last insured (20 CFR 404.1520(g)).

The Appeals Council denied Plaintiff's request for review on May 9, 2012, and the ALJ's decision became the final decision of the Commissioner. Tr. 1-3. Plaintiff filed this action in the United States District Court on July 13, 2012.

## **STANDARD OF REVIEW**

The only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389 (1971); Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1972). Under 42 U.S.C. §§ 423(d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, Plaintiff has the burden of proving disability, which is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a).

## MEDICAL EVIDENCE

Plaintiff sought treatment on June 26, 2007 from Dr. J. Stewart Haskin, Jr., an orthopaedist, upon referral from the Conway Medical Center Emergency Room for evaluation of left foot pain. Dr. Haskin's notes indicate that Plaintiff had been seen at the emergency room for foot pain that began five weeks earlier and earlier x-rays did not reveal a fracture. However, repeat x-rays ordered by Dr. Haskin revealed a stress fracture of the second metatarsal of Plaintiff's left foot. Tr. 241-242.

Plaintiff returned to Dr. Haskin's office on July 19, 2007 and saw Dr. James Yates, Jr. Dr. Yates noted Plaintiff's continued left foot pain, and that her foot remained swollen and tender across the fracture site. Dr. Yates recommended wearing a walking boot for two weeks and follow-up with Dr. Haskin. Tr. 240. A bone scan on the same date revealed osteopenia. Tr. 243.

On November 29, 2007, Plaintiff saw Dr. Haskin and complained of right foot pain. Although x-rays did not reveal a definite fracture, an examination of her right foot revealed swelling on the dorsal aspect, with moderate tenderness. It was recommended that Plaintiff began treatment for osteoporosis. Tr. 236-237.

On July 14, 2008, Plaintiff was treated in the emergency room for right foot pain. After obtaining x-rays, a physician opined that a fracture through Plaintiff's proximal diaphysis of her second metatarsal was probably a chronic stress fracture, which progressed into a full cortical fracture or a non-healing cortical fracture. Tr. 249.

Plaintiff was treated at Strand Orthopedic Consultants ("SOC") on October 1, 2008. Dr. Alexander J. Pappas noted that Plaintiff previously suffered from a stress fracture in her right foot two months prior, had also suffered from two fractures that same year, and had a history of fractures and bone spurs in her left foot. X-rays revealed that although she did not suffer from any fractures in her left foot, the second and third metatarsal bones in Plaintiff's right foot were fractured with

delayed healing. Plaintiff was placed in a walking cast. Tr. 294. Plaintiff returned to SOC on October 31, 2008. It was noted that she had been wearing a walking cast for one month, but was still experiencing right foot pain. X-rays revealed the fractures had yet to heal. Tr. 295. She followed up with SOC again on December 2, 2008. Notes from that visit indicate that her right foot had still failed to heal. She was instructed to quit smoking and to continue to wear the walking boot for one more month. Tr. 296.

On January 6, 2009, Plaintiff returned to the SOC. An x-ray and an evaluation of her right foot revealed a third and fourth metatarsal fracture. The fractures appeared to be the same with little change, and she continued to suffer from pain and trouble with ambulation associated with the fracture. She also suffered from left foot pain that, in the physician assistant's opinion, could have been associated with limping and changing mechanisms. Tr. 297.

On February 25, 2009, Plaintiff sought treatment at Conway Medical Center with left and right shoulder pain. An MRI of Plaintiff's left shoulder revealed degenerative disease of the acromioclavicular joint and tendinopathy of the rotator cuff. An MRI of her right shoulder showed tendinopathy of the rotator cuff without full thickness tear. Tr. 290-293.

On June 6, 2009, Plaintiff visited Conway Medical Center because she was experiencing hip pain. An x-ray view of her pelvis and left hip in neutral and frog leg lateral position demonstrated normal alignment, with superior medial joint space narrowing in each hip. Comparison with previous x-rays of December 12, 2006, showed she continued to suffer from osteoarthritic changes with no change from the previous x-ray. Tr. 318.

Dr. Charles Jackson, a psychologist, examined Plaintiff on September 2, 2009. He diagnosed Plaintiff with major depressive disorder, recurrent, moderate. Dr. Jackson assigned Plaintiff a global

assessment of functioning ("GAF)" rating of 45,[2] indicative of serious symptoms. He thought that Plaintiff was competent to manage funds on her own behalf. Dr. Jackson concluded that Plaintiff had the ability to consistently and independently take care of food, shelter, personal hygiene, and other responsibilities of daily living. He further found that she could consistently function socially and communicate with others without major problems arising, and could consistently and independently persist at and complete tasks in a timely manner. Tr. 330-334.

On September 14, 2009, Dr. Michael Neboschick, a state agency psychologist, completed a Psychiatric Review Technique form. Tr. 335-348. Dr. Neboschick opined that Plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. Tr. 345. Dr. Neboschick also completed a Mental Residual Functional Capacity ("RFC") Assessment wherein he opined that Plaintiff could understand and remember simple instructions; sustain attention for simple, structured tasks for periods of two-hour segments; adapt to changes if they were gradually introduced and infrequent; make simple work-related decisions;

---

[2]The GAF contains a numeric scale (0 through 100) used to rate the severity of psychological symptoms and/or social, occupational, or school functioning, generally for the level of functioning at the time of evaluation. A GAF score between 21 and 30 may reflect that "behavior is considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment." A score of 31 to 40 indicates some impairment in reality testing or communication or "major impairments in several areas," 41 to 50 indicates "serious symptoms" or "serious difficulty in social or occupational functioning," 51 to 60 indicates "moderate symptoms" or "moderate difficulty in social or occupational functioning," and 61 and 70 reflects "mild symptoms" or "some difficulty in social, occupational, or school functioning ." Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32-34 (4th ed. 2000). It should be noted that in the latest edition of the Diagnostic and Statistical Manual of Mental Disorders:
> [i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice.

Am. Psychiatric Assen, Diagnostic & Statistical Manual of Mental Disorders 16 (5th ed. 2013).

maintain appropriate appearance and hygiene; recognize and appropriately respond to hazards; work in the presence of others; accept supervision; and work best in settings that did not require much direct ongoing interaction with the public. Tr. 351.

Dr. Regina Roman performed a consultative examination on October 19, 2009. She noted that Plaintiff had full range of motion of the cervical spine; full range of motion of both shoulders (with some increased discomfort), elbows, wrists, knees, hips, and ankles; and no joint effusions. Plaintiff's muscle strength was normal and she had intact sensation in both the upper and lower extremities. She was alert and oriented in all spheres. Plaintiff was able to tandem walk though her gait was slow, she had normal stance and posture, and she did not use an assistive device. She also had intact fine dexterity movements of the fingers. Dr. Roman diagnosed Plaintiff with history of bilateral metatarsophalangeal fractures with nonunion; fibromyalgia syndrome; longstanding tobacco abuse with history of chronic obstructive pulmonary disease ("COPD") and bronchitis; extensive findings on MRI of both shoulders; bilateral hallux deformities with callus formation, greater on the left than the right; depression and chronic pain syndrome; status post hysterectomy secondary to fibroids; and status post tubal ligation. Tr. 359-360.

Plaintiff returned to Conway Medical Center on October 19, 2009 and was evaluated by Dr. Scott Crane. X-rays revealed no fractures or dislocations, but mild spurring of Plaintiff's right first metatarsalphalangeal ("MTP") joint and spurring of the calcaneus (heel bone). Dr. Crane opined that Plaintiff still suffered from degenerative changes of her right foot. Tr. 362.

On October 22, 2009, medical consultant Mary Lang completed a Physical RFC Assessment form. Ms. Lang noted that Plaintiff suffered from foot pain due to issues with delayed healing of fractures, shoulder tendinopathy of the rotator cuff with subdeltoid bursitis, and degenerative disease of the glenohumeral joint and acromioclavicular joint. She was also diagnosed with osteoporosis and

7

ambulatory issues from her ankle, knee, hip, back pain, shoulder pain, and slow gait. Ms. Lang opined that Plaintiff's symptoms of pain with walking were credible due to hallux valgus and plantar fasciitis, reducing her RFC due to pain. Tr. 363-370.

In January 13, 2010, Dr. Elliot Bettman completed a medical source statement of ability to do work-related activities (physical), in which he opined that Plaintiff could occasionally carry up to ten pounds, but never lift any weight; sit for ten minutes at one time and for thirty minutes total in an eight-hour workday; stand for five minutes at one time and for ten minutes total in an eight-hour workday; walk for five minutes at one time and for ten minutes total in an eight-hour workday; never reach, handle, finger, feel, and push and pull; occasionally use her feet to operate foot controls; never climb, balance, stoop, kneel, crouch, or crawl; and never perform activities involving exposure to unprotected heights, moving mechanical parts, operating a motor vehicle, humidity and wetness, environmental irritants, extreme cold and heat, and vibrations. Tr. 192-198.

In May 2010, Dr. Jim Liao, a state agency physician, completed a Physical RFC Assessment form. He opined that Plaintiff could occasionally lift twenty pounds and frequently lift ten pounds; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; frequently push and/or pull with bilateral upper extremities; occasionally reach overhead with his upper extremities; occasionally push and pull foot controls with her right lower extremity; occasionally climb ramps, climb stairs, and crawl; and frequently balance, stoop, kneel, and crouch. He also opined that Plaintiff was precluded from concentrated exposure to pulmonary irritants and from even moderate exposure to work hazards. Tr. 388-395.

## HEARING TESTIMONY

At the June 2011 hearing, Plaintiff testified that she broke her feet two years prior to the hearing and they still hurt all the time because they had not healed properly. Tr. 33. She stated she had to lie down to relieve the pain and that standing on her feet made the pain worse. Tr. 34. Plaintiff testified she had chronic back pain due to fibromyalgia Tr. 35. She stated she had fatigue associated with COPD, and used an inhaler every day. Tr. 37. She testified she had shortness of breath when taking a shower and she had bronchitis every three months. Tr. 37. Plaintiff stated she needed to quit smoking cigarettes, but still smoked a little less than a pack per day. Tr. 38. Plaintiff testified she had shoulder pain and difficulty lifting her arms (Tr. 38-39), could not concentrate and felt depressed (Tr. 39), cried sometimes, and had trouble getting out of bed on some days (Tr. 39-40).

## DISCUSSION

Plaintiff alleges that the ALJ: (1) failed to evaluate the cumulative effect of her multiple impairments; (2) performed an improper credibility analysis; (3) erred by placing excessive weight on her abilities to perform some daily activities when evaluating her RFC; and (4) he failed to meet his burden at step five of the sequential evaluation process[3] by impermissibly relying on the medical-vocational guidelines. The Commissioner contends that the final decision is supported by substantial evidence[4] and free of reversible legal error.

---

[3] In evaluating whether a claimant is entitled to disability insurance benefits, the ALJ must follow the five-step sequential evaluation of disability set forth in the Social Security regulations. See 20 C.F.R. § 404.1520. The ALJ must consider whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to her past work, and (5) if not, whether the claimant retains the capacity to perform specific jobs that exist in significant numbers in the national economy. See id.

[4] Substantial evidence is:
> evidence which a reasoning mind would accept as sufficient to support a
> (continued...)

9

A.      Combination of Impairments

Plaintiff alleges that the ALJ failed to evaluate the cumulative effect of her multiple impairments including bilateral foot pain, fibromyalgia, depression, and bilateral shoulder pain. She argues that the ALJ's failure to make "particularized findings" on this issue does not comport with Fourth Circuit law. The Commissioner contends that the ALJ's credibility determination showed that Plaintiff's subjective complaints were considered together without distinguishing between specific impairments and that the ALJ considered Plaintiff's disabling pain and depression, and reasonably found that her subjective complaints were not credible to the extent alleged.

In evaluating a claim for disability insurance benefits, the Commissioner is required to consider the combined effects of a claimant's impairments, and he must adequately explain his evaluation of the combined effect of those impairments. Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989); Hines v. Bowen, 872 F.2d 56 (4th Cir. 1989); Reichenbach v. Heckler, 808 F.2d 309, 312 (4th Cir. 1985). These factors are mandated by Congress' requirement that the Commissioner consider the combined effect of an individual's impairments, 42 U.S.C. § 423(d)(2)(B), and the general requirement by the courts that an ALJ explicitly indicate the weight given to all relevant evidence. Murphy v. Bowen, 810 F.2d 433, 437 (4th Cir. 1987); see also Hines, 872 F.2d at 59.

Here, it is unclear from the decision that the ALJ adequately considered the combined effects of Plaintiff's severe and non-severe impairments. The ALJ merely stated that the "claimant did not

---

[4](...continued)
       particular conclusion. It consists of more than a mere scintilla of evidence but
       may be somewhat less than a preponderance. If there is evidence to justify a
       refusal to direct a verdict were the case before a jury, then there is "substantial
       evidence."
Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984); Laws v. Celebreeze, 368 F.2d 640, 642 (4th Cir. 1966). It must do more, however, than merely create a suspicion that the fact to be established exists. Cornett v. Califano, 590 F.2d 91, 93 (4th Cir. 1978).

have an impairment or combination of impairments that met or medically equaled one of the listed impairments..." Tr. 14. There is no indication that the ALJ fully considered Plaintiff's impairments in combination.

B. RFC

Plaintiff alleges that the ALJ erred in evaluating her RFC because the ALJ placed excessive weight on her ability to perform some daily activities and because substantial evidence does not support the ALJ's findings that she could perform a full range of light work. The Commissioner contends that substantial evidence supports the ALJ's assessment of Plaintiff's RFC because the ALJ properly found that Plaintiff's subjective complaints were not fully credible and the ALJ properly gave little weight to Dr. Bettman's opinion of disability.

The ALJ's RFC assessment should be based on all the relevant evidence. 20 C.F.R. § 404.1545(a). Social Security Ruling 96-8p requires that the RFC assessment "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." The RFC must "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis...." SSR 96-8p. The ALJ must discuss the claimant's ability to work in an ordinary work setting on a regular work schedule. Id.

As it is unclear that the ALJ properly considered Plaintiff's combination of impairments, it is unclear that the ALJ properly determined Plaintiff's RFC. Further, the ALJ discounted the opinion of Plaintiff's treating physician (Dr. Bettman) and gave significant weight to the opinion of the state agency physician (Dr. Liao), but then discounted parts of Dr. Liao's opinion. It is unclear why the ALJ discounted Dr. Liao's opinion that Plaintiff could do no than occasional pushing and pulling of foot controls with her right lower extremity (and Dr. Bettman's opinion that Plaintiff could only

occasionally operate foot controls). The ALJ stated that Dr. Liao's limitations on Plaintiff's right lower extremity for pushing/pulling was "not supported by the medical evidence of record or the claimant's activities of daily living." Review of the medical record, however, indicates that x-rays of Plaintiff's left foot revealed a stress fracture in June 2007, July 2008 x-rays of Plaintiff's right foot revealed a probable chronic stress fracture which progressed into a full cortical fracture or a non-healing cortical fracture, October 2008 x-rays showed right foot metatarsal fractures with delayed healing, December 2008 x-rays showed right foot fractures that still failed to heal, and January 2009 x-rays revealed metatarsal fractures. Although an October 19, 2009 x-ray revealed no fractures or dislocations, it showed mild spurring of Plaintiff's right MTP joint and spurring of the calcaneus. The radiologist (Dr. Crane) wrote that Plaintiff still suffered from degenerative changes of her right foot. Also in October 2009, Dr. Roman noted that Plaintiff had a history of bilateral MTP fractures with nonunion (Tr. 360), and Ms. Lang opined that Plaintiff's use of foot controls should be limited to occasionally (Tr. 365).[5] The ALJ discounted Dr. Liao's limitation on exposure to pulmonary irritants and hazards, stating they were not supported by the medical evidence of record or Plaintiff's activities of daily living. However, Plaintiff reported using an inhaler every day, experiencing shortness of breath with taking a shower, and suffering from bronchitis about every three months. Dr. Roman noted longstanding tobacco abuse with history of COPD and bronchitis.

As discussed above, the ALJ failed to properly analyze Plaintiff's combination of impairments and her RFC. The failure to do so may affect the other allegations of error asserted by Plaintiff concerning her credibility and the use of the Grids at step five of the sequential evaluation

---

[5]It is unclear from the record whether Lang is a physician. Her RFC assessment does not indicate such, but there is a disability determination transmittal form in the record that is signed by "Mary S. Lang, M.D." (see Tr. 47).

process. In particular, it is unclear from the ALJ's decision whether Plaintiff is able to perform the full range of unskilled work despite a finding that she has "moderate limitations in the understanding, remembering and carrying out simple instructions." Thus, it is recommended that upon remand the Commissioner take into consideration Plaintiff's remaining allegations of error.

## **CONCLUSION**

The Commissioner's decision is not supported by substantial evidence. This action should be remanded to the Commissioner to properly consider Plaintiff's combination of impairments, to determine her RFC in light of all of the evidence, to continue the sequential evaluation process including obtaining VE testimony if necessary, and to take into consideration Plaintiff's remaining allegations of error.

Based on the foregoing, it is RECOMMENDED that the Commissioner's decision be **reversed** pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be **remanded** to the Commissioner for further administrative action as set out above.

Joseph R. McCrorey
United States Magistrate Judge

October 2, 2013
Columbia, South Carolina